Curtiss R. Justus,                                              :
                                                               :
                    Petitioner                                 :
                                                               :
          v.                                                   :  No. 1556 C.D. 2015
                                                               :  Submitted: June 3, 2016
Workers' Compensation Appeal                                   :
Board (Bay Valley Foods),                                      :
                                                               :
                    Respondent                                 :


BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE JAMES GARDNER COLINS, Senior Judge


OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE COLINS**                          **FILED:  August 10, 2016**


          Melisa Peckham-Justus (Claimant) petitions for review of the July 28,
2015 order of the Workers' Compensation Appeal Board (Board) affirming the
March 17, 2014 decision and order of the Workers' Compensation Judge (WCJ);
by that order, the WCJ granted a Motion to Dismiss filed by Bay Valley Foods
(Employer) and dismissed Claimant's Fatal Claim Petition.  Claimant's Fatal
Claim Petition was filed on April 22, 2013, and alleged that Claimant's husband,
Curtiss R. Justus (Decedent) died on July 20, 2012 as a result of a subarachnoid
hemorrhage that occurred while he was in the course and scope of his employment
as a first shift line mechanic with Employer.  (Claimant Petition for Compensation

by Dependents of Deceased Employee, Reproduced Record (R.R.) at 4a.) For the reasons set forth below, we affirm.

During a hearing held on June 21, 2013 Claimant, who is a registered nurse, testified. (June 21, 2013 Hearing Transcript (H.T.), R.R. at 61a-100a.) At a second hearing, held on November 12, 2013, the WCJ heard oral argument regarding the Motion to Dismiss filed by Employer, and Claimant offered a report authored by Dr. Eric Lee Vey, M.D., a forensic pathologist. (November 12, 2013 H.T., R.R. at 101a-216a; September 24, 2013 Northwestern PA Autopsy Pathology Services Report, R.R. at 225a-229a.)[1] Also at the second hearing, Claimant offered the testimony of Dale Robinson, an emergency management coordinator with oversight of the HazMat team who responded at the scene; Eric Rogers, a criminal investigator for the Pennsylvania State Police (PSP); Donald King, Jr., Employer's maintenance supervisor, who was Decedent's direct supervisor; and Sam Reed, a maintenance technician.

King testified that Employer produced salad dressings and barbeque sauce, and Decedent was assigned to support Employer's production line #3 during times of faulty operation and to give breaks to the personnel on the line. (November 12, 2013 H.T., R.R. at 150a-151a, 177a.) King stated that approximately 50-100 feet outside the main plant building there was a water-cooling/treatment shed that housed an evaporative cooling system used to cool a cooking process inside the plant, with a 50-gallon tank, a pump and piping; the system circulated cool water pumped through an evaporative cooler and fan

---

[1] Dr. Vey's report was offered as *prima facie* evidence of Claimant's Fatal Claim Petition. Although a hearsay objection was sustained as to its admissibility for the case in chief, the WCJ reviewed the report in order to address the Motion to Dismiss. (WCJ Decision and Order, Finding of Fact (F.F.) ¶ 9, R.R. at 16a.)

apparatus. (*Id*., R.R. at 151a-152a.) He testified that Decedent was assigned to maintain the water quality in the system, which entailed testing for PH level and adding an anti-microbial additive if necessary; he compared the task to maintaining pool water and stated that the testing was done once a week, or more frequently when they were using a cooking process to which the tower and water system was applied. (*Id*., R.R. at 152a, 179a.) No other employees were responsible to check the water-cooling system in the shed, and the shed was kept locked; in addition to Decedent, keys to the shed were held by Sam Reed, Employer's lead mechanic, and a third key was kept in a key locker in the maintenance storeroom. (*Id*., R.R. at 155a-156a.) Various anti-microbial chemicals were stored inside the shed, including a pool chlorinator and an acidic baseline solution for calibrating the PH meter, and there was an exhaust fan that ran continuously on a thermostat. (*Id*., R.R. at 157a, 171a.) King stated that Decedent normally either came to his office or called him to let him know that he was going to the shed, and the door to the shed did not have to be closed in order to complete the task; he described the door as a standard size double door that faced away from the plant – "[a]s you're facing it, the left-side door being a pin-type door to where you would flip a latch on the top and bottom of the door to lock it into place and the right-side door would actually be the handle door to open." (*Id*., R.R. at 177a-178a, 180a.)

King testified that at approximately 1:40 p.m. on July 18, 2012 he was in a meeting shortly after lunch when the line production supervisor interrupted the meeting to tell him that he hadn't seen Decedent for about 45 minutes, and to ask King if he knew where he was; King left the meeting and returned to the production floor to start a search of the facility, attempting to reach Decedent on his cell phone, calling two or three other mechanics, and deploying

other personnel to check restrooms, equipment, storerooms, and the parking lot. (*Id*., R.R. at 158a, 162a-163a, 167a.) He stated that he went to the cooling shed to check there and, finding the door locked from the inside and not having a key, he banged on the door; King called Sam Reed and directed him to find a key and open the shed, and proceeded to the parking lot to check Decedent's vehicle. (*Id*., R.R. at 162a-163a.) King testified that while he was checking Decedent's vehicle, Sam Reed and another employee used a key to enter the shed and found Decedent slumped in the corner; they immediately called 911; King acknowledged that records showed that EMS had been dispatched at 2:16 p.m., and he estimated that approximately ten minutes had elapsed between the time he had been notified that Decedent was missing and the time that Decedent was found. (*Id*., R.R. at 172a.)

Reed testified that he used his key to open the locked door to the shed to find Decedent lying face down, still breathing; he and another employee pulled him out of the building and flipped him over, noticing vomit on the floor near where Decedent's face had been. (*Id*., R.R. at 198a.) He stated that he had observed Decedent checking the water-cooling system on previous occasions and that the door to the shed would typically be left open. (*Id*.)

Eric Rogers, a Criminal Investigative Officer with the PSP confirmed that the paramedics transported Decedent to the hospital at 2:35 p.m., before Rogers arrived at the scene; Rogers arrived at 4:15 p.m. and interviewed both Reed and King, and Reed reported to him that there had been no odor coming from the shed when they opened the doors. (*Id*., R.R. at 133a, 140a.) Rogers stated that because of the size of the shed, the fact that Decedent was found with vomit coming from his mouth, and the presence of chemicals inside the shed, he decided to call in the HazMat team. (*Id*., R.R. at 143a.) Rogers interviewed the HazMat

chemist on the scene, who reported that the shed appeared to be properly ventilated and chemical exposure did not appear to be the cause of the incident. (*Id*., R.R. at 144a.) Dale Robinson, the HazMat emergency management coordinator testified that a request had emanated from Crescent Hose Company, the first responders, earlier in the day at around 2 p.m., with a report of a possible chlorine release, but that the request for a HazMat team response had then been cancelled; it was only after Rogers arrived on the scene approximately two hours later that the HazMat team was again called to respond, to ensure that the area was safe for PSP investigation. (*Id*., R.R. at 133a-144a.)

Claimant testified that she received a phone call from Employer's human resources department on the day of the incident informing her that her husband had been taken, unresponsive, to UPMC Hamot and that they thought he may have had a stroke. (June 21, 2013 H.T., R.R. at 81a, 83a.) When Claimant arrived at UPMC Hamot, she found her husband in the decontamination area; she next saw him in one of the ER treatment rooms, intubated. (*Id*., R.R. at 84a.) She stated that an ER physician informed her that they thought her husband had sustained some kind of burns to his lungs, and that he would be transported by helicopter to UPMC Mercy in Pittsburgh. (*Id*.) She drove there, arriving approximately an hour and a half after Decedent; she was told that they were concerned because he was not waking up and they were going to do a CT scan of his head. (*Id*., R.R. at 85a.) Thereafter, however, the head nurse informed her that Decedent had 'coded' enroute to the CT scan, and that he was still alive but they did not know if he would survive through the evening. (*Id*., R.R. at 86a.) Decedent survived through the evening and the next morning, physicians of various specialties advised Claimant that they would be looking at the best course

of treatment, and later advised her that they would be treating Decedent for a heart attack; Claimant testified that she became angry, and told the assembled physicians that she was an ICU nurse, and the fact that Decedent's pupils had gone from normal and reactive to fixed and dilated in a span of an hour indicated to her that Decedent had sustained a brain injury. (*Id*., R.R. at 87a.) At that point, Claimant testified, Decedent was taken for another CT scan of his head; shortly thereafter, physicians returned to tell her that her husband had sustained a global bleed affecting his brain stem and was brain dead, and Decedent died on the following day. (*Id*., R.R. at 88a.)

The WCJ dismissed Claimant's Fatal Claim Petition for failure to provide *prima facie* evidence that his death was work related and thus a compensable fatal claim. Claimant appealed to the Board, which affirmed the decision and order of the WCJ. This appeal followed.[2]

In a claim proceeding under the Workers' Compensation Act (Act),[3] the burden is on the claimant to establish all elements necessary to an award, including the existence of injury, disability, and its duration. *Inglis House v. Workmen's Compensation Appeal Board (Reedy)*, 634 A.2d 592, 595 (Pa. 1993); *Lewis v. Workers' Compensation Appeal Board (Andy Frain Services, Inc.)*, 29 A.3d 851, 861 (Pa. Cwmlth. 2011). Section 301(c) of the Act, 77 P.S. §411(1), provides that:

---

[2] This Court's review of an order of the Board is limited to determining whether the necessary findings of fact are supported by substantial evidence, whether Board procedures were violated, and whether constitutional rights were violated or an error of law was committed. *MV Transportation v. Workers' Compensation Appeal Board (Harrington)*, 990 A.2d 118, 120 n.3 (Pa. Cmwlth. 2010).

[3] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2708.

> The terms "injury" and "personal injury," as used in this act, shall be construed to mean an injury to an employee, regardless of his previous physical condition, arising in the scope of his employment and related thereto, and such disease or infection as naturally results from the injury or is aggravated, reactivated or accelerated by the injury; and whenever death is mentioned as a cause for compensation under this act, it shall only mean death resulting from such injury and its resultant effects, and occurring within three hundred weeks after the injury.

77 P.S. § 411(1). In *Pawlosky v. Workers' Compensation Appeal Board (Latrobe Brewing Company)*, 525 A.2d 1204, 1209 (Pa. 1987), our Supreme Court held that a job-related aggravation of a pre-existing disease constitutes an "injury" within the meaning of Section 301(c)(1) of the Act. Under Section 301(c)(1), a claimant has the burden of proving by unequivocal evidence that the injury arose in the course of the employment and that the injury was related to that employment. *Krawchuck v. Philadelphia Electric Company*, 439 A.2d 627 (Pa. 1981). Accordingly, it is a well-established rule that unless there is an obvious causal connection between a worker's death and the work injury, the claimant must present unequivocal medical evidence establishing the connection. *Dobash v. Workers' Compensation Appeal Board (PG Energy)*, 836 A.2d 1085 (Pa. Cmwlth. 2003).

Here, there is no dispute that Decedent's death was the result of a subarachnoid hemorrhage (SAH) that was not causally related to his employment. Claimant argues, instead, that Decedent sustained, in essence, an aggravation of his SAH, as a result of Employer's premises or the condition of his employment, which resulted in a delay in treatment and a misdiagnosis of his condition, which substantially contributed to his death. In dismissing the Fatal Claim Petition, the WCJ concluded that the delay in Decedent being found inside the locked cooling

shed and the erroneous diagnosis due to the presence of chemicals therein did not cause an aggravation of Decedent's non-work related condition, the SAH, which caused his death. (WCJ Decision and Order, Conclusion of Law ¶ 4, R.R. at 17a.) Before the Board and before this Court, Claimant argues that the WCJ erred as a matter of law because the condition of Employer's premises and the operation of Employer's business substantially contributed to Decedent's death. Claimant contends that (1) the condition of the premises, namely that the cooling shed where Decedent was found was 50 to 100 feet from any other building or employee, led to a delay in Decedent receiving treatment; and (2) bleach found in the cooling shed, which was part of the operation of Employer's business, led to a misdiagnosis of Decedent's condition, which further delayed him receiving proper treatment for his condition. In its decision and order, the Board agreed with the WCJ's conclusion that there had been no aggravation of Decedent's underlying condition, i.e., the SAH, and further stated that a determination that his death was causally related to his employment would be "tenuous and greatly attenuated at best under these circumstances and cannot be considered a proximate cause of [the SAH] or ultimate demise." (Board's Opinion and Order, R.R. at 40a.)

Initially, we must state that we disagree with the Board's determination that the working conditions were not shown to have affected Decedent's diagnosis and treatment. It is clear from the record that conditions of the workplace, and in particular the existence of chemicals in the cooling shed that led the first responders to provide erroneous information to UPMC Hamot, could be found to have produced a significant delay in Decedent's receipt of proper treatment following his SAH. However, the medical evidence presented was not sufficient to establish within a reasonable degree of medical certainty that this

8

delay contributed substantially to Decedent's tragic death and for this reason, the WCJ did not err in granting Employer's Motion to Dismiss and dismissing Claimant's Fatal Claim Petition.

The medical evidence consists of a report from Dr. Eric Lee Vey, M.D., a forensic pathologist, who summarized the salient features of the case and opined as follows:

> Curtiss Justus was pronounced dead at UPMC-Mercy hospital in Pittsburgh at 2:50 p.m. on July 20, 2012, as a consequence of a subarachnoid hemorrhage (SAH). On July 18, 2012, at Bay Valley Foods located in Northeast, PA, it was noted that Mr. Justus had been missing for several hours. He had last been seen at approximately 11:30 a.m. At approximately 2:00 p.m., a search of the facility was conducted. Mr. Curtiss was located in the cooling tower shed on [the] north side of the Bay Valley Foods facility. Co-workers stated that they found the employee lying face down, in the corner of the tower shed, unconscious, with erratic breathing and vomit on his upper torso. The co-workers moved the employee outside of the shed and proceeded to alert emergency medical services.
>
> EMS responders arrived, and assessment of Mr. Justus at the scene by Franklin Fisher, Crescent Hose Co. Rescue Chief, disclosed that Mr. Justus was "choking and gagging." The shed was known to contain bleach solution (i.e. sodium hypochlorite) containers and a container of sulfuric acid. Due to the uncertain nature of the incident, and that the aforementioned liquid chemicals were stored in the shed, the HazMat team was contacted and asked to respond to the scene. They did respond to the scene and determined the scene to be safe from any chemical exposure or contamination. All chemical containers were found to be securely capped at the time of arrival, and appeared to have been capped during the entire incident.

9

In the meantime, EMS transported Mr. Justus to UPMC-Hamot, and during transport, Mr. Justus was noted to have an active gag reflex and was responsive to pain. Based on the EMS report provided en route to Hamot by the EMS crew during transport, a "code orange" (i.e., chemical response) was initiated by the emergency department at UPMC-Hamot in preparation for the arrival of Mr. Justus and the EMS crew. Upon arrival at Hamot, Mr. Justus was admitted and processed through the decontamination room. He required ventilator support, for which he was sedated with etomidate, chemically paralyzed with succinylcholine, and intubated. A portable chest radiograph was ordered, showed diffuse bilateral alveolar infiltrates, and was clinically interpreted as being a manifestation of adult respiratory distress syndrome (ARDS). The possibility of ARDS and the specter inhalation chemical burn resulted in a decision to transfer Mr. Justus to the UPMC-affiliate hospital with a greater specialization in toxic inhalation injury, namely UPMC-Mercy, in Pittsburgh. …No anti-hypertensive medications were administered to Mr. Justus while at Hamot. No CT scan of the head was performed while Mr. Justus was at Hamot.

Mr. Justus arrived at UPMC-Mercy via helicopter ambulance transport, with an admission registration time at that facility of 6:19 p.m. (i.e., 1819 hours) on July 18. ...Information was conveyed from the investigating agencies in Erie (e.g. HazMat, [Pennsylvania State Police] to the physicians at Mercy Hospital during the evening of Mr. Justus's admission…that no open toxic chemicals or vapors were isolated from the cooling tower shed…On July 19 at approximately 3:44 p.m., Mr. Justus was finally diagnosed with a SAH following a successful CT scan of his head…Brain death protocol was initiated and the patient was pronounced brain dead [at] 2:50 p.m. on July 20, 2012. The Allegheny County Office of the Medical Examiner certified the cause of death as "subarachnoid hemorrhage" and the manner of death as "natural."

10

> Mr. Justus's case is representative of a spontaneous non-traumatic SAH, 85% of which are due to acute rupture of an intracranial saccular (berry) aneurysm.

(September 24, 2013 Northwestern PA Autopsy Pathology Services Report, R.R. at 225a-229a.) In his report, Dr. Vey noted that in the setting of an SAH, timely diagnosis is critical and only when the diagnosis is made can appropriate and potentially life-saving treatment be initiated. (*Id.*, R.R. at 227a.) He further stated that delays in diagnosis and initial misdiagnosis of SAH are alarmingly common, reported in 51% and 25% of cases, respectively. (*Id.*, footnotes omitted.) Dr. Vey concluded that in Petitioner's case, "the proper diagnosis and institution of appropriate treatment for his SAH was hampered by two temporal delays, both stemming from his workplace circumstances. First, because the confined and isolated workplace area in which Mr. Justus was initially stricken was in a location apart from others, there was a delay of several hours in finding him…Second, the presence of chemicals…where he was found…and the absence of witnesses associated with this workplace environment, led health care providers to initially diagnose him as a victim of chemical or toxic exposure." (*Id.*, R.R. at 228a.)

In his report, Dr. Vey opined, within a reasonable degree of medical certainty that "workplace-related delays encountered in [Decedent's case] substantively contributed to his poor outcome, lessened his likelihood of achieving a more improved result, and reduced his chances of survival." (*Id.*) This testimony did not establish, within a reasonable degree of medical certainty, that the delay in treatment was a substantial cause of death. Dr. Vey reported that the medical condition that caused Decedent's death was an SAH, which was not related to his employment with Employer. He offered no opinion as to what treatment would have been provided or that the delays caused a worsening of the

11

SAH.  Neither a poor outcome, the lessening of the likelihood of achieving a more improved result, nor a reduction in his chances for survival rises to the level of medical evidence to establish that Decedent would not have died as a result of the non-work related SAH but for the delay in diagnosis and proper treatment caused by Decedent's work conditions.  Claimant failed to establish *prima facie* evidence of a compensable fatal claim; therefore, the Board did not err in its decision to grant Employer's Motion to Dismiss and to dismiss the Fatal Claim Petition.  We affirm.

_____
**JAMES GARDNER COLINS, Senior Judge**

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Curtiss R. Justus,                       :
                                         :
                Petitioner               :
                                         :
        v.                               : No. 1556 C.D. 2015
                                         :
Workers' Compensation Appeal             :
Board (Bay Valley Foods),                :
                                         :
                Respondent               :

## **O R D E R**

AND NOW, this 10th day of August, 2016, the Order of the Workers' Compensation Appeal Board in the above-captioned matter is hereby AFFIRMED.

_____

**JAMES GARDNER COLINS, Senior Judge**