Phillips Family Chiropractic and　　　:
State Farm Fire and Casualty,　　　　:
　　　　　　　　　　　Petitioners　：
　　　　　　　　　　　　　　　　　：
　　　　　　　v.　　　　　　　　　：
　　　　　　　　　　　　　　　　　：
Workers' Compensation Appeal　　　：
Board (Phillips),　　　　　　　　　：　No. 1205 C.D. 2018
　　　　　　　　　Respondent　　：　Submitted: March 8, 2019

BEFORE:　HONORABLE P. KEVIN BROBSON, Judge
　　　　　HONORABLE ANNE E. COVEY, Judge
　　　　　HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY　　　　　　　　　　　FILED: June 14, 2019

　　　　Phillips Family Chiropractic, PC and State Farm Fire & Casualty Co. (collectively, Petitioners) petition this Court for review of the Workers' Compensation (WC) Appeal Board's (Board) July 31, 2018 order affirming the Workers' Compensation Judge's (WCJ) decision granting Craig Phillips' (Claimant) Claim Petition. Petitioners present one issue for this Court's review: whether the Board and the WCJ erred as a matter of law by granting Claimant's Claim Petition. After review, we affirm.

　　　　Claimant is a chiropractor and the sole shareholder of Phillips Family Chiropractic, PC. On September 21, 2015, Claimant filed the Claim Petition alleging that he sustained a work-related injury on April 6, 2015, described as a left shoulder superior labrum anterior to posterior (SLAP) tear caused by chiropractic manipulation. Petitioners filed an Answer, denying the material averments of the Claim Petition. The WCJ held hearings on December 1, 2015 and March 7, September 12, and December 12, 2016.

On May 30, 2017, the WCJ granted the Claim Petition and awarded temporary total disability benefits from July 22, 2015 through July 28, 2015. Beginning July 29, 2015, the WCJ awarded open-ended partial disability benefits based on Claimant's return to modified-duty work. The WCJ concluded that Claimant's imputed earnings were insufficient to reduce his compensation rate below the state maximum rate for 2015, and ordered Claimant to receive benefits at the rate of $951.00 per week for all weeks of payment. Petitioners appealed to the Board. On July 31, 2018, the Board affirmed the WCJ's decision. Petitioners appealed to this Court.[1]

Petitioners argue that the WCJ erred by granting Claimant's Claim Petition because Findings of Fact (FOF) 2, 3 and 5 through 13 and Conclusions of Law (COL) 2 and 4 through 8 are not supported by substantial evidence. "Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Washington v. Workers' Comp. Appeal Bd. (State Police)*, 11 A.3d 48, 54 n.4 (Pa. Cmwlth. 2011) (quotation marks omitted). Further, the law is well established that "[t]he WCJ is the ultimate factfinder and has exclusive province over questions of credibility and evidentiary weight." *Univ. of Pa. v. Workers' Comp. Appeal Bd. (Hicks)*, 16 A.3d 1225, 1229 n.8 (Pa. Cmwlth. 2011). "The WCJ, therefore, is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses." *Griffiths v. Workers' Comp. Appeal Bd. (Red Lobster)*, 760 A.2d 72, 76 (Pa. Cmwlth. 2000).

---

[1] "On review[,] this Court must determine whether constitutional rights were violated, errors of law were committed, or necessary findings of fact were supported by substantial competent evidence." *Stepp v. Workers' Comp. Appeal Bd. (FairPoint Commc'ns, Inc.)*, 99 A.3d 598, 601 n.6 (Pa. Cmwlth. 2014).

2

## Findings of Fact

Finding of Fact 2 states: "Claimant personally appeared before [the WCJ] and testified on four separate occasions. Based on his demeanor and [the WCJ's] personal observation of him during the hearings, [the WCJ] find[s] his testimony to be credible, truthful and straightforward in its entirety." WCJ Dec. at 11, FOF 2. Because Claimant did, in fact, testify at four separate hearings, *see* Notes of Testimony (N.T.) December 1, 2015, March 7, September 12, and December 12, 2016, and credibility is within the exclusive province of the WCJ, *see Griffiths*, Finding of Fact 2 is supported by substantial evidence. "[T]he law is clear that neither the Board nor the Court may review the evidence or reweigh the WCJ's credibility determinations." *Pa. Uninsured Employers Guar. Fund v. Workers' Comp. Appeal Bd. (Lyle)*, 91 A.3d 297, 303 (Pa. Cmwlth. 2014).

Finding of Fact 3 reads: "Claimant sustained an injury on April 6, 2015. Claimant's injury is described as an acute anterior labral tear and a [SLAP] tear with pre-existing glenohumeral arthritis." WCJ Dec. at 11, FOF 3. Claimant testified that "April 6th" was his "best guestimate" of his injury date, Reproduced Record (R.R.) at 109, based on when his co-worker went out on maternity leave because he knew it happened during that time. *See* R.R. at 106. Although Claimant admitted he did not know the exact date of injury,[2] as explained by the WCJ, Claimant "provided a credible and logical explanation for how he determined a date of injury." WCJ Dec. at 12, FOF 8. Further, James P. Bradley, M.D. (Dr. Bradley) testified:

> Q. Doctor, based on your clinical examinations, the diagnostic tests you reviewed, your operative results, do you have an opinion to a reasonable degree of medical certainty as to [Claimant's] diagnosis?

---

[2] Because Claimant was both the employee and employer, he did not know he was entitled to WC benefits. Thus, Claimant did not report the injury until after he became aware that he was covered under his WC insurance.

A. Yes. He had a traumatic Type V SLAP tear with pre-existing gleno[]humeral arthritis.

R.R. at 253. Dr. Bradley elaborated on cross-examination: "It's more than a SLAP. Remember, it's an anterior labral tear and a SLAP tear. That was the acute event. The arthritis was not. And there really wasn't much else wrong with the shoulder."

R.R. at 270. Accordingly, Finding of Fact 3 is supported by substantial evidence.

Finding of Fact 5 provides:

For employees with wages fixed by the year, the average weekly wage is calculated by dividing the annual earnings by 52 weeks. Based on Claimant's testimony that he earned a salary of $160,000[.00] in 2015, 2014, and 2013, [the WCJ] find[s] that Claimant has an average weekly wage of $3,076.92. Based on the average weekly wage of $3,076.92, Claimant is entitled to the maximum compensation rate for 2015 of $951.00 per week, beginning July 22, 2015, when Claimant stopped working in anticipation of undergoing shoulder surgery.

WCJ Dec. at 11, FOF 5. Relative to his wages, Claimant testified:

Q. In 2013, what salary were you being paid through the S corporation?

A. $160,000[.00].

Q. In 2014[,] what salary were you being paid?

A. $160,000[.00].

. . . .

Q. That was an annual salary?

A. Correct.

Q. In 2015[,] at the beginning of the year, what was your salary set at?

A. $160,000[.00].

4

Q. Did you continue to receive your salary payments of $160,000[.00] up until you went off of work for the surgery that you testified about at the first hearing?[3]

A. Yes.

Q. At that time, did you stop paying yourself a salary?

A. Yes.

R.R. at 135-136. Claimant also submitted a Statement of Wages indicating an annual salary of $160,000.00. *See* R.R. at 236-237 (Ex. C-03). Accordingly, Finding of Fact 5 is supported by substantial evidence.

Finding of Fact 6 states: "Claimant returned to performing administrative functions for Employer two days following his surgery of July 27, 2015; however, he did not resume payments to himself until February of 2016, when he paid himself $1,500[.00]. Thereafter, he has paid himself $1,000[.00] per week." WCJ Dec. at 11, FOF 6.

Claimant related:

Q. Since you stopped paying yourself, around the time of your surgery, have you paid yourself anything in wages from the S corporation until the current time?

A. I did for the very first time, the last pay period, which was right at the end of February.

Q. What did you pay yourself at that time?

A. $1,500[.00].

Q. And that payment was --- constituted from when to when? Give us a period of time.

A. From the beginning of the year, I guess, until that pay period. That was the first money I had withdrawn.

. . . .

---

[3] Claimant testified that his "last day with patients was July 22nd." R.R. at 99.

Q. Now, following your surgery, did you go back to work? In any capacity?

A. I did. Immediately in an administrative -- resumed my administrative capacity working from home, remoting in with a computer beginning just a day or two after the surgery. And I continued to do those administrative procedures.

R.R. at 137-138. Claimant further testified:

Q. You indicated at a prior hearing that you started in January of 2016 paying yourself a salary? Have you continued to pay yourself a salary?

A. I have.

Q. What is the salary you have been paying yourself since then?

A. It is $2,000[.00] every two weeks or $1,000[.00] every week.

R.R. at 177-178. Accordingly, substantial evidence supports Finding of Fact 6.

Finding of Fact 7 reads: "I accept as credible Claimant's assertion that he has been unable to perform chiropractic duties since his surgery, due to limited range of motion and strength in his left shoulder. His testimony is corroborated by the credible opinion of his treating surgeon, Dr. Bradley." WCJ Dec. at 12, FOF 7.

Dr. Bradley opined:

Q. Do you have an opinion to a reasonable degree of medical certainty as to whether [Claimant], since the time of his surgery to the current time, could go back and [] perform [his] job duties as a chiropractor, full duty, no restrictions whatsoever?

A. He cannot.

Q. Can you describe what he cannot do and why, please?

A. Well, his strength is not back. His motion is not back. And he can't forcibly load someone. Which are all requirements of being a chiropractor.

6

R.R. at 254-255. Accordingly, substantial evidence supports Finding of Fact 7.

Findings of Fact 8, 9 and 10 state:

8. **I accept Dr. Bradley's opinions as credible for the following reasons**. First, he is a well-qualified orthopedic surgeon who specializes in sports medicine and shoulder and elbow surgeries. Dr. Bradley's diagnosis of a traumatic Type V SLAP tear and anterior labral tear with pre-existing glenohumeral arthritis is supported by his physical examination findings, the diagnostic studies and his intraoperative findings. I note that he based his opinion that Claimant was injured during an acute event on the history provided by the Claimant. Although Claimant testified to being uncertain of the precise date of injury, I find his testimony to be credible and consistent that the injury occurred as a result of a sudden event while manipulating a patient. I also find that Claimant provided a credible and logical explanation for how he determined a date of injury. Because I find [] Claimant to be credible in regard to his history, I find Dr. Bradley's opinions based on that history to be credible.

9. **I find Dr. Bradley's opinions regarding [] Claimant's functional capacities to be credible**. I accept his opinion that Claimant is unable to return to his full duties as a chiropractor, providing hands-on manipulations of patients. Dr. Bradley supports this opinion by explaining that Claimant's range of motion and strength have not returned to the level that would allow him to perform these activities. I further accept Dr. Bradley's prognosis that Claimant's ability to return to chiropractic duties will depend on how much strength and motion he is able to regain. According to Dr. Bradley, although full strength and mobility have not been regained, the surgery was a success in that Claimant has improved stability in his shoulder.

10. In regard to Claimant's imputed earnings, **I do not find the analysis or testimony of Erin Saniga** [(Saniga)] **to be credible**. Her analysis is inconsistent with [] Claimant's testimony regarding his actual business practices. [] Saniga valued [] Claimant's administrative functions as $54,031[.00] to $63,100[.00] per year on a full time basis in the Butler County area. I do not find it to be credible or believable that an administrative position would offer

7

wages in this range in Butler County. [] Saniga valued [] Claimant's patient care functions as up to $46,800[.00] per year. Adding the two together, she opined that Claimant has total imputed earnings of between $100,000[.00] and $109,000[.00] per year. She based her patient care valuations on Claimant's stated availability of nine hours per week at a reimbursement rate of $25[.00] per 15-minute unit.

In rebuttal, Claimant testified that an appropriate salary for an office manager performing administrative duties is $33,000[.00] per year. He based this assertion on the actual pay of his office manager, who he pays $16.50 per hour. I find this to be a more appropriate and credible estimation of earnings for performing administrative functions in Butler County as opposed to up to $63,000[.00] per year. Further, it is based on what Claimant actually pays an individual to perform these functions. Claimant asserted that [] Saniga's valuation of his patient care duties inappropriately assumes that all fees generated equal dollar for dollar income. Claimant testified that his imputed earnings for his patient care activities would need to be adjusted to account for business expenses and overhead. I find the $46,800[.00] figure must be reduced by 50 percent, so that Claimant's imputed earnings for his modified patient care work amount to $23,400[.00]. I find this reduction is supported by Claimant's credible testimony that overhead is typically 50 percent of his office's billings. It is further supported by his testimony of how compensation for the other chiropractors and independent contractors in his office is determined. Specifically, Dr. [Amber] Butler is paid 55 percent of her collections, with any excess going back into the business, and the two independent contractor massage therapists are paid 50 percent of their generated income, with 50 percent going to the business. Additionally, these figures are supported by the amount Claimant has determined that he can actually pay himself while still keeping his practice running. I find Claimant has an imputed earnings capacity of $33,000[.00] for administrative work and $23,400[.00] for patient care, for a total of $56,400[.00]. This figure is further supported by Claimant's testimony that he has been paying himself $1,000[.00] per week for a total of $52,000[.00] per year. At this rate, he anticipated year-end-profits of $5,000[.00] to $8,000[.00] for 2016, so he would be unable to pay himself more.

8

I acknowledge Claimant is not a vocational expert, however, **I still find his lay testimony to be more credible than the opinions of** [] **Saniga**, because they are based on his actual business practices. Even without [] Claimant's testimony in this regard, **I do not find the opinions of [] Saniga to be credible**, because there is no support that administrative roles would pay in the range that she asserts. I also find that her valuation of [] Claimant's services in patient care fail to account for any business expenses and would not generate a dollar for dollar return to the Claimant in income.

WCJ Dec. at 12-13, FOFs 8-10 (emphasis added).

This Court has explained:

To constitute a reasoned decision within the meaning of Section 422(a) [of the WC Act (Act)[4]] a WCJ's decision must permit adequate appellate review. *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.)*, . . . 828 A.2d 1043 ([Pa.] 2003). Where medical experts testify by deposition, a WCJ's resolution of conflicting evidence must be supported by more than a statement that one expert is deemed more credible than another. *Id.* '[S]ome articulation of the actual objective basis for the credibility determination must be offered for the decision to be a 'reasoned' one which facilitates effective appellate review.' *Id.* . . . , 828 A.2d at 1053.

*Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 194-95 (Pa. Cmwlth. 2006) (footnote omitted). "However, **Section 422(a) [of the Act] does not permit a party to challenge or second-guess the WCJ's reasons for credibility determinations**. Unless made arbitrarily or capriciously, a WCJ's credibility determinations will be upheld on appeal." *Dorsey*, 893 A.2d at 195 (emphasis added). Here, the WCJ articulated her reasons for finding Dr. Bradley and Claimant credible, and Saniga not credible. Because they are not arbitrary or capricious, Petitioners are not permitted to challenge or second-guess those reasons.

---

[4] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 834.

9

Finding of Fact 11 reads:

Claimant is entitled to temporary total disability benefits from July 22, 2015 through July 28, 2015. Based on Claimant's imputed earnings of $56,400[.00] per year, he remains entitled to partial disability benefits at the rate of $951.00 a week from July 29, 2015 and ongoing, as his earning capacity has not reached a level to reduce his weekly compensation rate from the maximum rate for a 2015 injury.

WCJ Dec. at 13, FOF 11.

Claimant testified on three separate occasions that he made $160,000.00 per year before his July 27, 2015 surgery. He further testified that he went back to work performing administrative duties two days thereafter. Claimant expressly testified that he began paying himself a salary of $1,000.00 per week in January 2016. *See* R.R. at 177-178. Because Claimant was receiving the maximum weekly compensation payable,[5] and his receipt of $1,000.00 a week did not affect that amount, Finding of Fact 11 is supported by substantial evidence.

Finding of Fact 12 states:

Claimant is entitled to reimbursement of the UPMC Health Plan lien with 80% of $6,669.05, owed to Equian, and 20% owed as counsel fees. Additionally, Claimant is entitled to reimbursement of his out-of-pocket medical expenses of $4,614.94 and reimbursement of $939.85 from his personal Health Savings Account.

WCJ Dec. at 13, FOF 12.

Claimant submitted a Consolidated Statement of Benefits from UPMC Health Plan indicating a "[b]alnce [d]ue" of "$6,669.05." Certified Record (C.R.) Item 23 (Ex. C-09). Further, Claimant submitted a list of his medical expenses he

---

[5] *See* Section 105.2 of the Act, added by Section 4 of the Act of March 29, 1972, P.L. 159, 77 P.S. § 25.2 ("The terms 'the maximum weekly compensation payable' and 'the maximum compensation payable per week,' as used in this [A]ct, mean sixty-six and two-thirds per centum of 'the Statewide average weekly wage' . . . .").

paid from his personal checking account, totaling "$4,614.94," as well as the medical expenses he paid from his Health Savings Account, totaling "$939.85." C.R. Item 22 (Ex. C-08). Accordingly, Finding of Fact 12 is supported by substantial evidence.

> Finding of Fact 13 states in relevant part:
>
> The two law firms representing Claimant incurred reasonable litigation costs as follows:
>
> Payable to Conboy Law, LLC
>
> . . . .
>
> TOTAL               $510.90
>
> Payable to Dillon, McCandless, King, Coulter & Graham, LLP:
>
> . . . .
>
> TOTAL               $5,226.49

WCJ Dec. at 13-14, FOF 13 (emphasis omitted).

Claimant submitted an Amended Bill of Costs signed by Timothy Conboy, Esquire, indicating the costs of four certified transcripts totaling "$510.90" "[p]ayable to Conboy Law, LLC" and the costs of medical records, deposition fee and a certified transcript totaling "$5,226.49" "[p]ayable to Dillon, McCandless, King, Coulter & Graham." C.R. Item 28 (Ex. C-14). Accordingly, substantial evidence supports Finding of Fact 13.

## Conclusions of Law

Conclusion of Law 2 states: "Claimant met his burden of proving he sustained an injury in the course of his employment on April 6, 2015 in the nature of an acute Type-V SLAP tear and anterior labral tear." WCJ Dec. at 14, COL 2.

"Under Section 301(c)(1) [of the Act[6]], a claimant has the burden of proving by unequivocal evidence that the injury arose in the course of the employment and that the injury was related to that employment." *Justus v. Workers' Comp. Appeal Bd. (Bay Valley Foods)*, 147 A.3d 1237, 1241 (Pa. Cmwlth. 2016).

> Here, Dr. Bradley testified:
>
> Q. Based on the history you received from [Claimant], do you have an opinion as to the causation of his diagnosis?
>
> A. Yeah. He had what we call an acute SLAP event. We see them a lot in pictures [sic] and athletes where they'll be fine for periods of time. And they tend to have these [sic] labral mobility. Their labrum is mobile. And then all of the sudden, it just goes from a good SLAP to a bad one when it just rips off. And it's kind of the straw that broke the camel's back and that's it.
>
> Q. Are you relating that to the injury he described to you?
>
> MR. SUTTER: If I could note an objection. It's a leading question.
>
> A. Yes. I'm describing the way that SLAP tears typically present themselves.
>
> Q. Just so I'm not in trouble because of the objection, doctor, do you have an opinion as to the causation of the diagnosis as you gave it to us?
>
> A. Yes. **I think it was from him manipulating the patient**.

R.R. at 253-254 (emphasis added). As Claimant is a chiropractor and Dr. Bradley testified that the injury occurred during manipulation of a patient, Claimant met his burden of proving that the injury occurred in the course of his employment.

> Conclusion of Law 4 states:
>
> Claimant established that he has been unable to return to work in his full duty capacity since July 22, 2015. He has

---

[6] 77 P.S. § 411(1).

been limited to modified duty since July 29, 2015, when he resumed some light duty functions for the Employer. Benefits are suspended from April 7, 2015 through July 22, 2015, as Claimant had no wage loss during that time.

WCJ Dec. at 14, COL 4.

"If an employee does not incur an immediate wage loss for an observable physical disability, the protections granted by the Act can only be achieved by issuing a suspension order[.]" *U.S. Steel Corp. v. Workmen's Comp. Appeal Bd.*, 437 A.2d 92, 94 (Pa. Cmwlth. 1981). Here, Claimant estimated that his injury occurred on April 6, 2015. However, Claimant declared that his "last day with patients was July 22nd[,]" R.R. at 99. Thus, a suspension of WC benefits from April 7, 2015 through July 22, 2015 was required because Claimant had no wage loss during that time. Accordingly, Conclusion of Law 4 is supported by the record evidence and well-established law.

Conclusion of Law 5 states:

Commencing July 22, 2015, Claimant is entitled to wage loss benefits at the maximum compensation rate of $951[.00] per week in the form of temporary total disability benefits from July 22, 2015 through July 28, 2015. Beginning July 29, 2015, based on Claimant's return to work in a modified duty capacity, his benefit status is changed to temporary partial disability, at the benefit rate of $951[.00] per week, because his imputed earnings are insufficient to reduce his compensation rate below the statewide maximum rate for 2015. Statutory interest is due on all past due benefits.

WCJ Dec. at 15, COL 5.

Pursuant to Section 306(b) of the Act, 77 P.S. § 512, an employer must pay a partially disabled employee (generally, a residually injured employee who returns to some level of work at a reduced wage) sixty-six and two-thirds per cent of the difference between his or her pre-injury wage and the reduced wage.

13

*Landmark Constructors, Inc. v. Workers' Comp. Appeal Bd. (Costello)*, 747 A.2d 850, 856 n.6 (Pa. 2000). Here, as the record evidence established, Claimant returned to work at a lesser wage than his pre-injury wage because of his modified duties, and thus, he is entitled to the same WC payment because he was receiving the maximum payment and his partial disability earnings did not effect that amount.

> Conclusions of Law 7 and 8 state in relevant part:
>
> 7. Counsel fees in the amount of 20% of all past due benefits and interest, as well as future benefits, are approved as reasonable. . . .
>
> 8. All medical expenses, as referenced in the findings, shall be reimbursed to the lien holder and Claimant. Any outstanding bills should be paid pursuant to the Act. Twenty percent (20%) of the amount payable to Equian as the recovery agent for UPMC Health Plan should be deducted and paid to Claimant's co-counsel on a 50/50 split to the two law firms.

WCJ Dec. at 15, COL 7, 8.

It is well settled that "[u]nder Section 442 of the Act, [77 P.S. § 998,[7]] the WCJ must approve the contingent fee agreement and a twenty percent contingent fee is reasonable *per se.*" *Young v. Workers' Comp. Appeal Bd. (LGB Mech.)*, 976 A.2d 627, 631 (Pa. Cmwlth. 2009). Further, "Claimant's counsel is entitled to receive from [Equian] a proportionate twenty percent share of the subrogation award obtained through the efforts of Claimant's counsel." *Lamberson v. Workmen's Comp. Appeal Bd. (U.S. Silica)*, 654 A.2d 668, 674 (Pa. Cmwlth. 1995). Thus, based on the record and the law, the WCJ properly approved the counsel fees and correctly ordered that the medical expenses be reimbursed less counsel fees.

---

[7] Section 442 of the Act was added by Section 3 of the Act of February 8, 1972, P.L. 25.

14

**Conclusion**

Because the WCJ's Findings of Fact are supported by substantial evidence and the Conclusions of Law are supported by the Findings of Fact, the WCJ properly granted Claimant's Claim Petition.

For all of the above reasons, the Board's order is affirmed.

_____
ANNE E. COVEY, Judge

15

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Phillips Family Chiropractic and
State Farm Fire and Casualty,
               Petitioners

          v.

Workers' Compensation Appeal
Board (Phillips),
               Respondent

:
:
:
:
:
:
:
:
:
:  No. 1205 C.D. 2018
:

## O R D E R

AND NOW, this 14th day of June, 2019, the Workers' Compensation Appeal Board's July 31, 2018 order is affirmed.

_____
ANNE E. COVEY, Judge